STATE OF MAINE                     DISTRICT COURT
PENOBSCOT, SS.                     BANGOR
                                  CIVIL ACTION
                                  Docket No. CV-03-402



Darren J. Vittum et al.,
        Plaintiffs


        v.                        Decision and Judgment

Oak Ridge Builders, Inc.,
        Defendant

        Hearing on the complaint and counterclaim was held on July 5-9, 2005. Plaintiff

Darren J. Vittum, Frank Pawlendzio (the principal of defendant Oak Ridge Builders, Inc.)

and all counsel of record were present throughout the trial. Plaintiff Denise L. Vittum

was present for portions of the hearing.

        This action arises out of the construction of the Vittum residence in the Cedar

Grove Subdivision, a development that is located in Eddington and that is a creation of

Oak Ridge and Pawlendzio. Oak Ridge was the general contractor for the Vittum house.

In their complaint, the Vittums seek construction and application of a restrictive

covenant, which is included in their deed from Oak Ridge, governing the construction of

a detached garage that they wish to build on their lot. The Vittums also seek relief for

aspects of the house construction that they contend are defective. In its counterclaim,

Oak Ridge seeks its own declaratory judgment relating to restrictive covenants that

restrict landscaping activities conducted on lots within the subdivision and that require

homeowners to construct an asphalt apron that would connect a driveway to the way

located in the subdivision. Oak Ridge also alleges that Darren Vittum converted some

building materials.[1]

---

[1] In count 4 of their complaint, the Vittums also seeks to reform the deed, and in its
counterclaim, Oak Ridge has asserted a claim for nuisance. The parties have represented

1

## I. Vittums' complaint

### A. Detached garage (count 1)

The warranty deed conveying title of lot 6 in the Cedar Grove subdivision from Oak Ridge to the Vittums includes the following restrictive covenant: "The design of all single family residences, attached garages, and associated buildings is subject to the written approval of the subdivision developer or their [sic] designee. Such approval shall not be unreasonably withheld." *See* plaintiffs' exhibit 21, paragraph 7. Here, the Vittums seek a declaratory judgment that under this provision, they are entitled to construct a detached garage in a particular location on their lot.[2] Oak Ridge has objected to that planned construction. The Vittums contend here that Oak Ridge already agreed to allow them to build the structure and that its denial of approval now is unreasonable. The Vittums have not established either claim.

The Vittums first allege that during a chance encounter in the subdivision in August 2002, Darren Vittum told Pawlendzio that he planned to build the garage and that Pawlendzio at least implicitly agreed to that project. The conflicting testimonial evidence regarding that conversation does not provide an adequate basis for the court to reach that conclusion. Although during the conversation there was some reference to Vittum's storage of one of his vehicles, that does not establish that he informed Pawlendzio that he intended to build a structure for that purpose. It turns out that Vittum surreptitiously tape-recorded a conversation he had with Pawlendzio a short time after than initial encounter. *See* plaintiffs' exhibits 51, 51A. Although during the taped conversation Vittum and Pawlendzio made reference to the earlier discussion, nothing in the recording establishes that Pawlendzio had been told previously about the garage.

---

on the record that they are not pursuing these claims for relief, thus leaving the claims outlined in the text.

[2] Another restrictive covenant in the deed also prohibits the construction of anything other than single-family dwellings, attached garages and associated buildings. Oak Ridge's objection to the proposed construction of the detached garage here is not based on this provision, but rather it is grounded on the covenant number 7, which is set out in the text. It thus appears that Oak Ridge acknowledges that a detached garage is an "associated building," thus leaving in issue only the other requirements set out in covenant 7.

2

The evidence is at least as likely as not that Pawlendzio was unaware that the Vittums planned to build the garage until Pawlendzio saw that a concrete pad had been poured onto a location adjacent to the Vittums' driveway. Up to that point, there had been a graveled surface, and in fact during the initial conversation about the Vittums' vehicle, Pawlendzio told Vittum that he could take some gravel. However, it appears that when Pawlendzio saw the pad, he advised municipal officials who then contacted Darren Vittum, because Vittum had not obtained a building permit.[3] The court finds that the best explanation for Pawlendzio's recourse to the town's representative was that he had just realized what the Vittums planned to do and that, for the reasons discussed below, he – as Oak Ridge's agent – opposed the construction of the building in the intended location. The court doubts that Pawlendzio indicated knowing consent to Vittum during the first conversation and then retracted that approval after the Vittums had arranged for the concrete work. Instead, it is more reasonable to conclude that if Pawlendzio knew about the plans for the garage during the first conversation, as the Vittums contend here, he would have expressed his objection then. The absence of any objection is stronger evidence that Pawlendzio was unaware of the Vittums' plans than evidence of a change of heart.

Thus, the court concludes that Oak Ridge, through Pawlendzio, communicated its objection to the proposed detached garage reasonably close in time to when it became aware of those plans. This leads to the second question, namely, whether Oak Ridge has unreasonably withheld its approval from the Vittums. In this context, it is important to note the nature of the basis for Oak Ridge to withhold its consent. The restrictive covenant requires only that Oak Ridge shall not unreasonably withhold any such approval. This provision does not require that Oak Ridge's position must be the only reasonable assessment of the circumstances or even the most reasonable of several reasonable positions that might be available to it. Thus, so long as the basis for Oak Ridge's refusal to grant such approval is not unreasonable, then Oak Ridge's position will be deemed sufficient to bar the proposed construction. To this extent, the court's scrutiny of the basis for its objection is deferential.

---

[3] In August, when the issue first arose, Vittum applied for a building permit. The town denied the permit application but eventually issued a permit in October.

From portions of the subdivision, including the vantage point from Grandview Drive, which is one of the two ways in the subdivision, the view over the Vittums' property is sweeping. The grade of the Vittums' property falls away from the road and from other nearby lots, *see* defendant's exhibit 7 (subdivision survey with contour information), and this opens up the vista beyond the Vittums' house. The Vittums' house, which has an attached garage, is within that field of vision. The proposed detached garage would interfere with the remaining view. *See, e.g.,* plaintiffs' exhibits 82A, 86A (photographs showing slab, where detached garage would be built), 113B. Oak Ridge's concerns about the effect of the additional structure on the vista are not unreasonable.

The Vittums argue that Oak Ridge has opposed the construction of the building not because of its design but because of its proposed location, which is not a criterion established in the restrictive covenant. This contention, however, is abstract and ignores the integral relationship between the building as the Vittums have designed it and the effect the building will have on its surroundings. Oak Ridge has made clear that, it its view, the garage would be unobjectionable if located elsewhere on the Vittums' lot, but that the nature and design of the building would unduly interfere with aesthetic aspects of the land if located where the Vittums propose. *See* plaintiffs' exhibit 54. A structure is not built in isolation. Rather, it must be assessed in the context of its environment. This implicates inherent design considerations, and thus the nature of Oak Ridge's concerns fell within the scope of the covenant.

It bears note that Oak Ridge agreed to grant the consent required under the deed if the Vittums placed their power and other utility lines underground rather than running them on poles (an option that Oak Ridge made available to the Vittums through a proposed easement). This proposal does not undermine Oak Ridge's refusal to grant consent for the detached garage. When viewed from within the subdivision, the existing power poles are in the same vista as the proposed site of the detached garage. If the poles were removed (requiring the cables to run underground), then a material source of interference with the view would be gone, and the construction of the garage would not have the cumulative impact that it would if the poles were to remain.

4

It is also not unreasonable that the only design change to the detached garage on which Oak Ridge insists is a steeper roofline (10/12, instead of 5/12, as the Vittums have proposed) to match the rooflines of the house itself. This would have the effect of making the detached garage higher. However, it appears from the photographs that if the detached garage is build where the Vittums want it to be located, then the additional height will not create any greater significant intrusion into the view than would a garage of the same horizontal dimensions but lower height.

In their complaint, the Vittums seek a declaration on the question of whether Oak Ridge is entitled to exert its approval over the construction of a detached garage, as the covenant purports to do, and on the question of whether Oak Ridge has unreasonably withheld its approval to the Vittums' specific plans. The Vittums do not argue that the covenant itself is unenforceable or otherwise invalid, and for the reasons noted above, the court concludes that Oak Ridge did not act unreasonably in withholding its consent here.

## B. Construction defects

When the construction of the house was well underway, the parties fell into ongoing disputes regarding several aspects of the project, most notably issues relating to the third floor. In order to resolve those disputes, the parties executed an addendum to the original home construction contract. *See* plaintiffs' exhibits 28, 40. In the addendum, the Vittums acknowledged their satisfaction "with all aspects of the building construction to date." However, they also reserved any claims that would arise out of the "standard builder warranty." The court takes this to mean the warranty of good workmanship that is implied into any home construction contract of the magnitude present here. *See* 10 M.R.S.A. § 1487(7). The Vittums allege that construction work subsequently performed by Oak Ridge failed to meet this standard.[4] The alleged defects are enumerated in evidence generated by Stacey Goodwin, an estimator for a local contractor. The Vittums have established that most – but not all – of the problems that Goodwin identified are actionable. In examining the alleged problems, the court gives weight to evidence of the costs of repairs that she formulated. The base cost to repair each of the problems is enhanced by surcharges for disposal expenses (5%); for overhead, including insurance

---

[4] Oak Ridge operated as the general contractor but subcontracted virtually all of the work performed on the house.

(16%); for tax on materials (5%); and for margin (profit) (10%). These surcharges are standard and reasonable, and the court uses them in calculating damages where the Vittums have established the underlying loss.

Oak Ridge challenges many aspects of the Vittums' claim for defective construction work, arguing that they did not provide Oak Ridge with an adequate opportunity to address and correct the problems. The evidence belies this suggestion. In May 2003, Pawlendzio met at the Vittum residence with Goodwin and the Vittums themselves. Goodwin advised Pawlendzio of the work that, in her view, remained outstanding, and Pawlendzio agreed with much of her assessment. Pawlendzio assured the Vittums that he would line up Oak Ridge's subcontractors to return to the residence and correct the problems. (As is noted above, Oak Ridge's practice with Vittum home was to delegate the construction work to subcontractors; Oak Ridge did little or none of the work itself.) Only one of those subcontractors – the siding company – actually showed up. (Unfortunately, after some -- but not all -- of the problems with the siding were repaired during that visit, other problems developed, and these later problems are included in the Vittums' claim here.) The problem is best exemplified by the painting contractor, who stated that he did not make the time to do his remedial work at the residence. He also testified that Oak Ridge had already paid him in full for his work. The unavoidable conclusion is that he had no motivation to follow up with the repair work, because he had nothing to gain by expending further time and labor for the Vittums' benefit. The Vittums commenced this action in September 2003, four months after the meeting with Goodwin. The court is satisfied that Oak Ridge had ample opportunity to repair the problems that Goodwin had identified to it.

A problem of which Oak Ridge may not have been placed on notice at the May 2003 meeting was an unprotected electrical wire inside a wall in the living room. The electrician drilled a hole though a corner post and ran the wire through the hole. *See* plaintiffs' exhibit 73B. Because of the proximity of the wire to the interior wall surface, code requirements mandate that a strike plate must be placed in a way that would protect the wire. In light of Oak Ridge's failure to take meaningful steps to ensure that its contractors return to the house in response to Goodwin's assessment, the court has no reason to think that even if Oak Ridge had known of the electrical issue, it would have

6

caused the problem to be corrected in a timely way. The same analysis is true with a problem affecting the kitchen cabinets. Thus, the court charges Oak Ridge with the costs of these repairs as well.

Following Goodwin's analysis, *see* plaintiffs' exhibits 141-142,[5] the court discusses the alleged construction defects seriatim.

1. Sections of the exterior vinyl siding had come loose. As is noted above, the siding contractor returned to the residence after the May meeting with Goodwin and reattached the loose sections. Subsequently, however, the siding became loose again. Although this may be explained by the house's exposure to wind, it remains a problem and needs repair. Further, Goodwin and the siding contractor appear to disagree about the best way to secure the top rows of siding to the shell of the house: Goodwin recommends an undersill, and the contractor relies on a tight fit between the fascia and the top row of siding to prevent that section from coming loose. (The top of a section of siding is held in place by the bottom of the section that is immediately above it. This raises the question of how to secure the uppermost section itself.) Thus far, the contractor's method appears to be unsuccessful in this application. Further, although the siding contractor testified that he would not need as much time on the job as Goodwin has forecasted, his unsuccessful efforts to cure the siding problem weaken his testimony on this point. Thus, the court accepts Goodwin's analysis. The base cost to reattach the loose sections and to install the undersill is approximately $470. The surcharges noted above result in a total cost of roughly $615.

2. Water leaks into the basement because the seal around the sill is not adequate. The base cost to repair this problem is roughly $180. The surcharges noted above result in a total cost of roughly $240.

3. Goodwin testified that a ledger board that is part of the deck system is not adequately secured to the house. However, the Vittums and Oak Ridge agreed that Oak Ridge would not construct the deck and that the Vittums would build it if they chose.

---

[5] The portion of plaintiffs' exhibit 141 consisting of Goodwin's report was ultimately admitted. The remainder, made up of copies of code provisions, was excluded. Exhibit 142 was admitted as a summary of Goodwin's prospective testimony on her cost estimate. The court has used these exhibits to the extent allowed by the evidentiary rulings.

7

Because of this modification to the construction contract, Oak Ridge no longer became responsible for the ledger board.

4. The Vittums claim that Oak Ridge is required to provide three deadbolts in exterior doors. Goodwin herself testified, however, that a deadbolt is an option and is not a warranty item. The Vittums clearly wanted deadbolts, as shown by their request that Oak Ridge furnish doors with holes bored to accept the hardware. However, there is insufficient evidence that, under this arrangement, the installation of the doors without the deadbolts is a warranty breach.

5. The trim around the breezeway door was damaged during the construction process and needs to be repaired. The base cost for this repair is approximately $155. The surcharges noted above result in a total cost of roughly $205.

6. Oak Ridge did not construct steps that are needed to use the breezeway door, due to the height of the door. The construction code requires that the stair system include a landing and a rail. Oak Ridge contends that the Vittums agreed to assume responsibility for the steps in exchange for a reduction of the contract price. Because this claim amounts to an accord and satisfaction, Oak Ridge bears the burden of proving it. It has not done so. Oak Ridge tendered the Vittums a check that included the putative $100 refund for the steps. However, Oak Ridge conditioned acceptance of the check as "FINAL SETTLEMENT OF CONTRACT," *see* defendant's exhibit 2, which did not reflect any such agreement by the parties and which was clearly unrealistic when seen in light of the parties' ongoing disputes. Not surprisingly, the Vittums did not negotiate the check, and so there has not been an agreement on this point. Thus, the court holds Oak Ridge liable for this construction shortcoming. The base cost for this additional construction work is approximately $360. The surcharges noted above result in a total cost of roughly $480.

7. The sliding exterior door jams and cannot be opened properly. A representative of the manufacturer inspected the door and made an adjustment, after which the door worked properly for several days. The original problem then redeveloped. By itself, this might suggest a defect in the product. However, during an unrelated attempt to fix the problem, Oak Ridge or one of its subcontractors put a screw into the upper track for the slider. (It appears that the problem was with the upper part of

the door system causing the track to be too tight and the door to jam. The repair effort thus might have been an attempt to raise the upper track and allow additional clearance for the door. The actual source of the problem, however, may well be in the wall system above the slider.) This unsuccessful effort voided the warranty. And in any event, the use of a screw in the slider track is not a proper remedy because it may lead to other problems, such as thermal bridging. Therefore, the responsibility to cure the problem is now Oak Ridge's. The best evidence indicates that replacement of the slider unit will be necessary. The base cost to do so is approximately $1,450. The surcharges noted above result in a total cost of roughly $1,940.

8. Weatherstripping and the aluminum cladding on one side of a garage door require replacement attributable to Oak Ridge. (Damage to the cladding on the other side of the door is Darren Vittum's responsibility, and the Vittums do not seek recovery for that problem.) The base cost for this work is approximately $155. The surcharges noted above result in a total cost of roughly $205.

9. Despite construction code requirements arising from fire protection, the space between the garage and the breezeway has not been separate by sheetrock. The base cost for the sheetrock barrier is approximately $680. The surcharges noted above result in a total cost of roughly $900.

10. The weatherstripping at the bottom of the breezeway door was damaged, probably when someone tried to close the door while an extension cord was in the doorway. The total cost for this work is approximately $15.

11. At some point during the construction process, Darren Vittum created an ink mark on the dining room wall. The painting subcontractor later painted the walls in the room but did not seal the ink mark, which therefore bled through the finish coat and is now visible. Any dispute about responsibility for this problem is resolved by the painter's agreement to fix the problem. The base cost for this painting job is approximately $130. The surcharges noted above result in a total cost of roughly $170.

12. As is typical in new construction, some follow-up work is needed to patch cracks in sheetrock that are created as the house settles and dries. This will also require

9

some painting. The base cost for this work is approximately $965. The surcharges noted above result in a total cost of roughly $1270.[6]

13. The kitchen pantry door is defective and needs replacement. Because the product is under warranty, Oak Ridge's liability is limited to the cost of labor, which is $65. The surcharges bring this cost to $85.

14. The bedroom floor is excessively squeaky. Repair work will require the removal and reinstallation of furniture and carpeting in the room. The base cost to fix the floor is approximately $230. The surcharges noted above result in a total cost of roughly $300.

15. Finally, as is discussed above, electrical and associated cosmetic work will be needed to install a strike plate over an area where an electrical wire located inside a wall is not protected pursuant to code requirements. The base cost for this work is approximately $265. The surcharges noted above result in a total cost of roughly $350.

The total costs to repair these warranty defects is $6,775.

The Vittums have pursued these construction defect claims as claims for breach of warranty. This is the theory that is allowed by the terms of the parties' modified construction contract, and Goodwin, who is the plaintiff's liability expert on this part of the case, expressly framed her analysis on this basis. Thus, judgment will be entered for the Vittums on count 2, which alleges breach of contract. The Vittums have not meaningfully pressed a theory of negligence in their argument,[7] and so the court enters judgment for Oak Ridge on count 3.

In addition to the construction defect claims, the Vittums seek recovery of an amount equivalent to expenses they paid for extra rent and interest payments because Oak Ridge did not complete construction of the house within the time allowed by contract, which would have been in late 2001. (Under the contract, the house was to be substantially completed 120 days after construction commenced, which was late August

---

[6] This includes the charges described in the "stairwell" section of plaintiffs' exhibit 142 and the "misc. drywall repairs and touchups" line, which is the last item in the "living room-electrical" section of the same exhibit.

[7] Indeed, even in the section of their argument that purports to address their negligence claim, the plaintiffs attribute the construction defects to breaches of the construction contract.

or early September 2001). *See* plaintiffs' exhibit 28. In January 2002, however, the parties entered into a modified construction contract, which granted Oak Ridge until February 21 (30 days from the contract date) to substantially complete the construction project. *See* plaintiffs' exhibit 40. In that modified agreement, the Vittums waived any claim that might include later performance. In fact, the Vittums moved into the house in the middle of February. Thus, they have not established here that any material delay in the substantial completion of the house (that is, any delay past February 21) caused them any loss.

## II. Oak Ridge's counterclaim

### A. Conversion

In count 1 of its counterclaim, Oak Ridge alleges that Darren Vittum committed the tort of conversion by taking several pieces of dimensional lumber (2x4s) without permission. Vittum took the framing lumber from the construction site of another home on lot 8 in the development. The other homeowner, however, had paid Oak Ridge in advance for these materials. Therefore, Oak Ridge did not have an ownership interest in the property. Nonetheless, even if Oak Ridge has standing to pursue a claim for conversion, *see* RESTATEMENT (SECOND) OF TORTS § 225 (1965), Oak Ridge has failed to prove that Vittum was without authority to take the property under the circumstance involved here. The owner of lot 8 testified that he had told Vittum that he (Vittum) could use construction materials if he replaced them. This is the nature of the event underlying the conversion claim: Vittum took the lumber because he ran short of his own materials when he was doing some work on the third floor of his new house, and he then promptly bought new lumber to replace the ones he had taken. As applied to the Restatement formulation, it means that Oak Ridge has not established that it was entitled to immediate possession of the property, because the property owner had also entitled Vittum to take possession of the property. Further, Oak Ridge has not demonstrated that anyone (either it or the owner of lot 8) was damaged. Thus, Oak Ridge has not proven conversion.

### B. Declaratory judgment: landscaping restriction

The deed executed by Oak Ridge to the Vittums includes a restrictive covenant that provides, "Once construction is started on the within described lot, . . .all landscaping

11

shall be completed within two years from commencement of construction." *See* plaintiffs' exhibit 21. Oak Ridge began construction on the Vittums' house in late August or early September 2001. This would result in a late-summer 2003 deadline for the Vittum to complete "all landscaping" on their lot. In 2003, Darren Vittum hired a contractor to scrape off a layer of loam from a portion of the houselot and put the loam into piles. The contractor moved and screened roughly 800 cubic yards of the topsoil. Of this, Vittum sold approximately 500 yards. He has retained the balance, *see, e.g.,* plaintiffs' exhibits 83B, 91B, with which he intends to improve the grade of part of his property. Much of this area would be lawn, with some flowerbeds. Oak Ridge contends that this ongoing process violates the restrictive covenant and seeks enforcement of the provision that it contends bars this use of the property.

Pawlendzio's own testimony, however, demonstrates that the covenant at issue is virtually meaningless because the term "landscaping" does not have a definition that comports with his own understanding. For example, he testified that in his view, the removal and sale of loam is not a form of landscaping. That activity, however, can amount to a material and even radical reformation of the land on a lot. Further, he testified that he would not consider the importation of small amounts of loam onto a lot as something that rises to the level of "landscaping," and he also does not believe it would be reasonable to consider the creation of a new garden to amount to "landscaping." Indeed, Pawlendzio lives in a house on one of the subdivision lots, and even though the ostensible landscaping deadline applicable to him expired during the summer of 2004 (two years after he began the construction of his own house in June 2002), he has a pile of loam on his own lot. Further, Pawlendzio acknowledges that he landscapes his own lot a bit at a time. The record clearly demonstrates that a number of other homeowners in the subdivision are similarly situated.

When the issue is framed in the conventional terms of deed construction, it is plain that the term "landscaping" is ambiguous because it is vague. Accordingly, one must look to the intention of the parties to determine its meaning. *Dillingham v. Ryan*, 651 A.2d 833, 836 (Me. 1994). Further, when an ambiguity arises, it is construed more favorably to the grantee. *Rusha v. Little*, 309 A.2d 867, 870 (Me. 1973). Here, Pawlendzio has both engaged in on-site activities, and he has tolerated that of other local

12

homeowners, that are both at least as substantial (i.e., removing and selling 500 yards of topsoil) and also less substantial (flower gardening) as the conduct that the Vittums propose to pursue. From the way Oak Ridge itself has viewed the substance of the "landscaping" restriction in the Vittums' deed, it is wholly unclear what the provision allows and what it precludes. Oak Ridge's principal complaint about the earthmoving operation on the Vittums' lot is that the screening process created a lot of noise. However, because Pawlendzio conceded that the covenant would not prohibit a lot-owner from removing and selling topsoil, it would not prevent the noise problem.

Because of the fundamental lack of clarity and guidance provided in the covenant, both as it appears on the face of the deed and in the way that Oak Ridge proposes to apply it, the court declines to hold that the Vittums have violated the provision.

### C. Declaratory judgment: driveway apron

The Vittums' deed includes the following restrictive covenant: "Paved apron 15 feet from road to be completed by lot purchaser within 90 days of occupancy permit issuance." *See* plaintiffs' exhibit 21. The Vittums were issued their certificate of occupancy on February 8, 2002. *See* plaintiffs' exhibit 47. Under the terms of the covenant, the Vittums had until May 2002 to construct the apron. They have not done so, and Oak Ridge seeks a declaration that they are in violation of the covenant and an order of compliance.

In testimony, Darren Vittum explained that he has deferred construction of the apron because of the pendency of this litigation and because he has not finished putting in his lawn. The fact of litigation, in which the Vittums' compliance with the covenant is placed in issue, cannot be seen as an event that stays their obligation to comply with the covenant. Further, the evidence does not reveal a logically necessary sequence in which the lawn must be planted before the apron is constructed. (In fact, because the asphalt work will involve heavy equipment, it seems sensible for that work to precede grading and planting the lawn, because the latter is a more delicate operation.) The evidence indicates that the drainage in front of the house needs to be improved, and this may work may need to be done before the apron is built. However, such a sequence still does not justify the delay.

13

The Vittums' lot is not the only one where an apron has not been built within the time prescribed by the restrictive covenant. However, the court does not view that circumstance as one that amounts to a waiver by Oak Ridge of any rights it might assert here. The evidence does not suggest that compliance with the covenant is particularly burdensome to an extent that enforcement would be inequitable.

Finally, the restrictive covenant at issue here does not suffer from the same problem that renders the landscaping provision unenforceable in the context of this case. Unlike the latter, the covenant requiring the apron is clear and unambiguous.

For these reasons, the court finds that the Vittums have failed to comply with the covenant requiring construction of the apron. As soon as the weather allows that construction, they shall build the apron in compliance with the restrictive covenant forthwith.

The claims of the parties have met with mixed success. When viewed from a functional perspective, none of the parties can be viewed as the one that prevailed. *See* 14 M.R.S.A. § 1501. Consequently, the parties shall bear their own costs.

The entry shall be:

For the foregoing reasons, on count 2 of the complaint, judgment is entered for the plaintiffs in the amount of $6,775, plus pre-judgment interest at the annual rate of 8% and post-judgment interest at the annual rate of 10.36%. Judgment is entered for the defendant on counts 1 and 3. Count 4 of the complaint is dismissed on the plaintiffs' motion.

On the counterclaim, judgment is entered for the defendant (the counterclaim plaintiff) on that part of count 2 relating to the driveway apron. As soon as the weather allows such construction, the plaintiffs (the counterclaim defendants) shall build the apron in compliance with the restrictive covenant forthwith. On that part of count 2 relating to the landscaping provision of the deed and on count 1, judgment is entered for the plaintiffs (the counterclaim defendants). Count 3 of the counterclaim is dismissed on the defendant's motion.

No costs are awarded to any party.


Dated: February 17, 2006

_____
Justice, Maine Superior Court sitting
in Maine District Court

14

DARREN J VITTUM & DENISE L VITTUM VS OAK RIDGE BUILDERS INC
UTN:AOCSsr  -2003-0091212                    CASE #:BANDC-CV-2003-00402
------------------------------------------------------------------------

DARREN  J. VITTUM                                        PL
ATTY DEARBORN, JOEL  Tel# (207) 989-8501
ATTY ADDR:120 NORTH MAIN STREET BREWER ME 04412


DENISE  L. VITTUM                                        PL
ATTY DEARBORN, JOEL  Tel# (207) 989-8501
ATTY ADDR:120 NORTH MAIN STREET BREWER ME 04412


OAK RIDGE BUILDERS INC                                   DEF
ATTY RELLA, CARL  Tel# (207) 945-4722
ATTY ADDR:ONE CUMBERLAND PLACE, STE 314  PO BOX 2700 BANGOR ME 04402-2700
ATTY KLEIN, PETER  Tel# (207) 947-0111
ATTY ADDR:80 EXCHANGE ST PO BOX 1210 BANGOR ME 04402-1210


M=More, Space = Exit:M

Select the EXIT KEY for page selection line.